UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANDRE LAUGHLIN, )
    *Plaintiff*, )
)
*vs.* ) 1:09-cv-1503-JMS-DML
)
INTERNATIONAL UNION OF OPERATING )
ENGINEERS LOCAL 103 and IUOE LOCAL 103 )
APPRENTICESHIP AND TRAINING PROGRAM, )
    *Defendant*. )

**ORDER**

Plaintiff Andre Laughlin alleges that Defendants International Union of Operating Engineers Local 103 (the "Union") and the IUOE Local 103 Apprenticeship and Training Program (the "Program") discriminated against him on the basis of his race in violation of Title VII. [Dkt. 1-1.][1] Presently before the Court is Defendants' Motion for Summary Judgment. [Dkt. 22.]

**I.**
**STANDARD OF REVIEW**

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would, as a matter of law, conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2

---

[1] In Mr. Laughlin's response brief, he concedes that the admissible evidence does not support a claim for retaliation; a claim he asserted in his original complaint. [Dkt. 32 at 5; dkt. 1-1.] The Court therefore deems this claim voluntarily dismissed and will solely address his discrimination claim.

1

(1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial and cannot rely upon the mere allegations or denials in the pleadings. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. 317. The key inquiry is the existence of evidence to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

## II.
### BACKGROUND

Andre Laughlin, an African-American man, became a member of the Union in August 2006, [dkt. 23-1 at 15, 29], when he enrolled in the Program. [Dkt. 23-1 at ¶ 1.] The Program is a five-year apprenticeship operated by the Local 103 Joint Apprenticeship Committee (the "JAC"), a joint labor-management committee that controls apprenticeship and other training programs, [*id.* at 2]—it is comprised of Union appointees and signatory contractors with whom the apprentices work upon referral. [Dkt. 23-2 at ¶ 2.]

Apprentices in the five-year Program are required to participate in 5,568 hours of on-the-job training, attend classroom courses, and complete classroom work with signatory contractors. [*Id.* at ¶ 5.] The first 1,000 hours of every apprenticeship constitute a probationary period: The JAC may terminate the apprentice "without stated cause," or it may increase the probationary period for an apprentice who fails to progress satisfactorily.[2] [*Id.* at ¶ 6.]

---

[2] The JAC executes Program standards developed in cooperation with and approved by the Bureau of Apprenticeship and Training of the U.S. Department of Labor. [Dkt. 23-3 at 3.]

In May 2007, Mr. Laughlin was terminated by Atlas Construction, the signatory contractor with whom he was fulfilling probationary hours. [Dkt. 23-1 at 13-15.] In August 2007, he was fired by his next signatory contractor, Rieth Riley Construction. [*Id.* at 18-19.] Thereafter, the JAC, through its then-administrative manager, John Nunley, notified Mr. Laughlin that the JAC was extending his probationary period to 1,500 hours. [*Id.* at 28.]

That October, Laughlin filed a race discrimination charge with the Equal Employment Opportunity Commission ("EEOC") alleging that on the first day of the program, Mr. Nunley "singled [him] out for no reason," and "stated in front of the entire class that [he] wasn't going to amount to shit;'" furthermore, he alleged that the Union would "consistently send [him] out for fewer assignments than other white apprentices . . . ." [Dkt. 23-5.] He also stated that Mr. Nunley "verbally abused" him and "added 500 hours to the total [he] need[ed] to complete the apprenticeship program." [*Id.*]

In December 2007, while he was still fulfilling his probationary-hour requirement, Mr. Laughlin allegedly hit a doorway with the machinery he was operating.[3] [Dkt. 32-2.] His instructor, a signatory contractor, recommended more training. [*Id.*]

In March 2009, the JAC's new administrative manager, James Ratican, reported that Mr. Laughlin nearly hit an instructor with the boom of a backhoe he was operating at a training site.[4]

On April 3, 2009, while still in his probationary period, [dkt. 23-1 at 31-32], Mr. Laughlin was terminated from the program. [Dkt. 23-6.] Mr. Ratican, who made the termination

---

[3] Although Mr. Laughlin vaguely challenges the credibility of the hand-written report in which this allegation is contained, he does not articulate any formal objection, nor does he dispute the report's veracity. [Dkt. 32 at 5.]

[4] Again, Mr. Laughlin nebulously suggests that this report is not credible, but he makes no affirmative claim to that end, nor does he submit any evidence that disputes either that the report was made or that the incident giving rise to it occurred. [*Id.*]

decision, attributed that decision to Mr. Laughlin's apparent "lack of ability to operate heavy equipment, and lack of required classroom hours." [*Id.*]

On April 29, 2009, the EEOC issued a Dismissal and Notice of Rights. [Dkt. 23-7.] Mr. Laughlin later clarified that this alleged verbal abuse was not racial in nature, [dkt. 23-2 at 20-21], that Mr. Nunley did not actually know who he was or mention his name on the first day of the program, [*id.* at 22-24], and that Mr. Nunley never used any racial epithets over the course of his apprenticeship, [*id.* at 28-29].

### III.
### DISCUSSION

Mr. Laughlin alleges that he was discriminated based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e. Title VII prohibits discrimination against apprentices on the basis of race in the operation of apprenticeship training programs. 42 U.S.C. §2000e-2(d). The parties agree that Mr. Laughlin has no direct evidence of race discrimination, and that he therefore must prove his case indirectly, [dkt. 32 at 3], by demonstrating that: (1) he is a member of a protected class; (2) his performance as an apprentice was satisfactory; (3) he suffered an adverse action; and (4) he was treated less favorably than one or more similarly situated persons not within his protected class. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). If he succeeds in establishing a prima facie case, the burden shifts to Defendants to proffer a legitimate, non-discriminatory reason for its action. *Burks v. Wisc. Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Assuming Defendants can do so, the burden then shifts back to Mr. Laughlin to show that Defendants' proffered reasons were mere pretext for discrimination. *Id.*

The parties also agree that Mr. Laughlin is a member of a protected class and that he suffered an adverse employment action. Consequently, to make a prima facie showing of

discrimination, he need only show that his performance was satisfactory and that similarly situated white apprentices were treated more favorably than he. *Peters*, 307 F.3d at 545.

**A) Mr. Laughlin's Work Performance**

Although critical to his prima facie claim, Mr. Laughlin does not attempt to show that he was meeting his employer's legitimate performance expectations. [Dkt. 32.] In support of his claim, he argues merely that "the utter paucity of the Defendants' evidence of Mr. Laughlin's performance deficiencies . . . would alone point to an issue with [his] treatment and eventual termination by [D]efendants." [Dkt. 32 at 5.]

The Seventh Circuit has made clear that a pattern of performance deficiencies rebuts a claim that a plaintiff has met his employer's legitimate expectations. *Contreras v. Suncast Corp.*, 237 F.3d 756, 760-61 (7th Cir. 2001). The employee's subjective assessment of his performance is not evidence that deficiencies proffered by the employer are untrue. *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 865-66 (7th Cir. 1996).

Here, Mr. Laughlin argues that because the reports allegedly giving rise to his termination are scant, hand-written, and usually undated, they are not sufficient to support a legitimate reason for Mr. Laughlin's termination. [Dkt. 32 at 5.] Nevertheless, Mr. Laughlin concedes that during his first year as an apprentice, he was fired by two different contractors, [dkt. 23-1 at 13-15, 18], and that Defendants believe he misused safety equipment on several occasions, [dkt. 32 at 3-4]. Furthermore, he makes no claim that any of these alleged deficiencies is inaccurate, nor does he present any evidence that he was performing at the level expected by his employer.

Having failed to submit evidence that he was meeting his employer's legitimate expectations, Mr. Laughlin cannot make out a prima facie case for discrimination.

### B) Treatment of Similarly Situated Employees

Mr. Laughlin offers no evidence that similarly situated employees were treated better than him; instead, he proffers demographic statistics as "circumstantial evidence of intentional discrimination" by Defendants against African-American employees. [Dkt. 32 at 3-4.] Specifically, Mr. Laughlin argues that Defendants have a pattern and practice of discriminating against African-American employees, such that "it is clear that there is discriminatory animus at play" with respect to Mr. Laughlin.[5] [Dkt. 32 at 5.]

As an initial matter, an employee bringing a claim of race discrimination cannot raise a pattern-and-practice theory of discrimination in response to a motion for summary judgment if it was not raised in EEOC charges, in the initial complaint, in any amended complaints, or in the Case Management Plan. *Davidson v. Citizens Gas & Coke Utility*, 470 F. Supp. 2d 934, 945 (S.D. Ind. 2007). Here, Mr. Laughlin had the opportunity to assert as pattern-and-practice theory at each of these junctures in the pending litigation—he chose not to. [See Dkt. 1-1; dkt. 23-4; dkt. 10.] The Court therefore deems this heretofore unarticulated theory waived. *Davidson*, 470 F. Supp. 2d at 945).

Even if the Court allowed Mr. Laughlin to present his pattern-and-practice argument, however, evidence of a pattern or practice of discrimination is only collaterally relevant to an individual claim of discrimination—an individual plaintiff must still present evidence of specific discrimination against him. *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252, 1253 n. 8 (7 Cir. 1990). In other words, statistics, standing virtually alone, cannot establish a prima facie case of individual discrimination. *Id.* at 1253.

---

[5] Mr. Laughlin is not asserting a disparate impact claim. [Dkt. 32 at 4.] Rather, he simply proffers this statistical evidence as sufficient to establish his prima facie case under the burden-shifting standard articulated above. [*Id.* at 3-4.]

Here, Mr. Laughlin has presented no evidence of individual discrimination: He admits that no representative of either the Union or the JAC ever made any statements to him about his race or that were even racial in nature. [Dkt. 23-1 at 34-35.] Although he claims that the Union skipped over him on the job referral list, he does not identify any white apprentices who had received more job referrals. [*Id.* at 27.] And although he has strung together demographic statistics about African-Americans and whites, respectively, in the Union, he has not tendered the opinion of any expert who could analyze these statistics or put them in context; as such, his statistical evidence is inconsequential. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1177 (7th Cir. 2002).

Mr. Laughlin's slapdash statistical analysis, which not only stands alone, but by and large fails to consider relevant comparators[6], is not enough to bolster his claim that similarly situated

---

[6] Mr. Laughlin recites the demographic breakdown of Marion County, as well as that of the Union and the Program, presumably to show that there is a lower percentage of African-Americans working for the Union and the Program than there is in the general population of Marion County. [Dkt. 32 at 1.] As an initial matter, the Union does not draw exclusively from Marion County—the Court takes judicial notice that it draws from various counties in Indianapolis, Fort Wayne, and Kokomo, most of which have a much lower percentage of African-Americans living therein. *See* Fed. R. Evid. 201(c); *see also* http://www.iuoe103.org/ (accessed March 24, 2011); http://www.iuoe103training.org/ (accessed March 24, 2011); http://2010.census.gov/2010census/data/ (accessed March 24, 2011). In any event, that data— even if relevant to the Union's catchment area—is wholly irrelevant to the Union's practices without any supplemental information about how many African-Americans applied to the Union and were rejected, relative to similarly situated non-African-Americans who applied with the same credentials and were accepted. Mr. Laughlin goes on to explain the demographic breakdown of individuals who were terminated from the Program during his tenure, presumably to show that African-Americans had a higher per-capita termination rate than whites and other races. [*Id.* at 1-2] First. despite Mr. Laughlin's attempt to spin the data to show that when individual termination rates are measured against their absolute corollary, it appears that a larger percentage of African-Americans were fired than members of other races, that is a meaningless comparison—the actual termination rates seem to mirror the racial breakdown within the Union such that it undermines his proposition that African-Americans are terminated at disproportionately higher rates than members of other races. Even if the data were correctly interpreted, however, these numbers are equally irrelevant: The relevant comparison would be how many African-Americans who showed Mr. Laughlin's alleged deficiencies were terminated,

7

white employees were treated more favorably than he was—either when his probationary period was extended or when he was terminated from the apprenticeship program. Without evidence that white employees were actually similarly situated and still treated more favorably, Mr. Laughlin cannot make a prima facie showing of discrimination. The proof, if it existed, would be simple enough: submit evidence of a white probationary apprentice with a similar signatory contractor termination and safety record who was not terminated from the apprenticeship program. Mr. Laughlin has submitted no such proof. The Court therefore concludes that summary judgment is appropriate for Defendants. *See, e.g., Cerutti v. BASF Corp.*, 349 F.3d 1055, 1064 (7th Cir. 2003) ("A plaintiff does not reach the pretext stage . . . unless she first establishes a prima facie case of discrimination.").

### C) Pretext for Discriminatory Animus

If Mr. Laughlin could establish a prima facie case, which he cannot here, the burden would shift to the employer to present a legitimate non-discriminatory reason for the adverse employment action. *See Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 477 (7th Cir. 2010). The Seventh Circuit has held that poor work performance is a legitimate reason for termination. *See, e.g., Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 477 (7th Cir. 2010). Defendants offer specific documentation of Mr. Laughlin's termination by signatory contractors, and explain his termination with evidence of safety concerns in his operation of heavy machinery. To overcome summary judgment, Mr. Laughlin would in turn have to show that this reason was a pretext for unlawful discrimination. *See Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008).

---

relative to how many members of other races showed those same deficiencies and were not terminated. In short, the statistics Mr. Laughlin offers have no sociological significance.

"Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'" *See Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir. 1996). "[T]o meet this burden [Mr. Laughlin] must present evidence to suggest not that [Defendants were] mistaken in [terminating him] but that [they were] lying in order to cover up the true reason, [his race]." *See Vanasco v. National-Louis Univ.*, 137 F.3d 962, 966 (7th Cir. 1998); *see also Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("Although indirect proof of pretext is permissible, we must remember that, even if the business decision was unreasonable, pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason.") For the Court is "not a super-personnel department charged with determining best business practices, particularly when the work involves potential danger." *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999).

Mr. Laughlin argues that there is "discriminatory animus at play," based on statistics reflecting various ratios of white Union members to African-American Union members. [Dkt. 32 at 5.] The use of such statistics, however, cannot support a claim of pretext where a plaintiff fails to present any evidence of individual discrimination. *Clanton v. Kirk & Blum Mfg. Co., Inc.*, 2002 WL 31761363 *4 (S.D. Ind. 2002); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1177 (7th Cir. 2002). Mr. Laughlin has neither supplemented the unanalyzed demographic statistics with evidence of individual discrimination, nor contextualized them with expert testimony indicating that such racial animus exists—standing alone, they certainly do not prove that the Union was lying to hide what was in fact racial motivation for removing him from the Program. Even if Mr. Laughlin could get to the pretext stage of the analysis, then, he still could not overcome summary judgment.

Mr. Laughlin's failure to present either a prima facie case of discrimination or a showing of pretext is fatal to his lone remaining claim. The Court therefore finds that summary judgment is appropriate for Defendants.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment. [Dkt. 22.] Mr. Laughlin shall take nothing by way of his complaint. Judgment will enter accordingly.

03/24/2011

*[signature]*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE LLP
wgroth@fdgtlaborlaw.com

John Downey Pierce
attorneypierce1@yahoo.com